## STANDARD BUSINESS PREMISES LEASE

LEASE AGREEMENT made this 19th day of April, 1994, by and between THE NEW PEANUT FARM, INC., referred to as "Landlord", and PINETTE, INC., TERRY STAHLMAN, and JAMES GOARD, collectively referred to as "Tenant".

In consideration of acts performed and to be performed, mutual promises made and exchanged, monies paid and to be paid, and other good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

1. **Leased Premises.** Landlord hereby lets and leases to Tenant, and Tenant hereby leases and takes from Landlord that certain building located on real property in the Anchorage Recording District, Third Judicial District, State of Alaska, which real property is described as follows:

> Tract "K" of CAMPBELL CREEK COMMERCIAL PARK SUBDIVISION, according to the official plat thereof, filed under Plat No. 72-225; records of the Anchorage Recording District, Third Judicial District, State of Alaska.

In addition, to the extent of joint use of parking as described in this Lease, Tenant is authorized to make joint use of the following described parcel for parking:

> Tract "J-One" (J-1) of CAMPBELL CREEK COMMERCIAL PARK SUBDIVISION, according to the official plat thereof, filed under Plat No. 79-55; records of the Anchorage Recording District, Third Judicial District, State of Alaska.

The Leased Premises are more specifically described in the plat drawings and description attached as Exhibit "A".

2. **Term of Lease.** The term of this Lease shall be two years, commencing on the first day that Tenant opens business to the public and running from that date until two years thereafter, except that there shall be options to extend for five additional one-year periods in accord with paragraph 26 of this Lease. In addition, in the event that Tenant loses its legal ability to operate a non-alcoholic dance and show club (through no fault of

1

Exhibit 1

its own and after reasonable good faith efforts on its part to preserve the license), then Tenant can elect to terminate the Lease on 30 days written notice. However, in no event shall Tenant be due any refund or credit for any credit for rent under paragraph 7, and shall forfeit any such credits as consideration for being able to make early termination of the Lease.

3.  **Rent.**   Tenant agrees to pay Landlord rent in the amount of $5,000.00 per month during the initial two year period and during any extension periods for which the option is exercised. The rent for each month shall be paid to Landlord in advance at the address specified in paragraph 27 below, or at such other place as Landlord directs in writing from time to time. Such payments shall be made in advance on or before the 1st day of each calendar month. In the event that the term of this Lease commences on any day other than the 1st day of a calendar month, the first month's rent (and the last month's rent) shall be prorated for that month.

4.  **Security.** At the time of execution of this Lease, Tenant shall pay to Landlord the sum of $2,500.00 to assure payment of rent and as security against any default or breach of this Lease by Tenant. If Tenant defaults with respect to any provision of this Lease, including, but not limited to the provisions relating to the payment of rent, Landlord may (but shall not be required to) use, apply or retain all or any part of the security deposit for payment of any rent or any other sum in default, or for the payment of any amount which Landlord may spend or become obligated to spend because of Tenant's default, or to compensate Landlord for any other loss or damage which Landlord may suffer because of Tenant's default.

5.  **Utilities and Services.** Tenant shall be responsible for and shall timely pay the following:
    a.  Utilities, trash, heat and air temperature control, ventilation, sewer service, water service, snow removal on porches, steps and sidewalks of the Leased Premises, and all other utilities and services. The Tenant shall

promptly apply for and have installed at its cost separate meters for all utilities for the Leased Premises. Until completion of the installations, Tenant shall pay the allocated and prorated portions of utilities on joint meters as reasonably determined by the Landlord.

b. Reimburse Landlord for real property taxes for the building.

c. Reimburse Landlord for real property taxes for a proportionate area of land equal to the square footage covered by the building and its attachments and overhangs (based upon the proportional computation specified in Exhibit "B").

d. Obtain and maintain fire insurance as described in paragraph 14(b).

e. Obtain and maintain liability insurance as described in paragraph 14(a).

f. Make all maintenance, repairs and improvements reasonably required to place the building in reasonable operating condition and to maintain it in that condition and be responsible for the cost of such.

g. Keep in good repair and operation the two photo-cell floodlights on the northeast and northwest sides of the building, and shall assure that they provide flood lighting during non-daylight periods.

h. All improvements required to meet all federal, state, municipal or other governmental codes, zoning requirements, statutes and ordinances.

i. Reimbursement of Landlord for 33-1/3% of the total cost of snow removal, salting and sanding, cleaning, striping and similar parking area costs for the entire parking area on Tracts "K" and "J-1". Provided, however that Tenant shall be responsible for cleaning the parking lot of all rubbish (e.g. bottles, cans, paper and other

debris) on a daily basis at time of closing of its business.

All reimbursements required to be made by Tenant to Landlord shall be made within 10 days of billing by the Landlord to the Tenant.

6. **Alterations or Improvements to Premises.** Tenant shall have the right to make alterations or improvements in or to the Leased Premises, but such shall not be made without first obtaining the express written consent of Landlord, provided that the improvements and repairs described in Attachment "C" have already been approved. Such consent shall not be arbitrarily or unreasonably withheld. Any such alterations, additions or improvements approved by Landlord shall be made at Tenant's expense and Landlord may require, as a condition of approval that Tenant provide proof acceptable to Landlord that there will be payment of laborers, materialmen and contractors so that no liens can attach and on condition that Tenant agrees to return the Leased Premises in good condition with all improvements made before expiration of the term of this Lease. Nonstructural additions, alterations, or improvements to the premises which can be readily removed without damage to the premises (such as refrigeration units, bars, shelving, safes, counters, signs, and trade fixtures) shall not become a part of the realty and shall continue to be the property of Tenant. Structural improvements and those which cannot be readily removed without damage to the Leased Premises shall become the property of the Landlord. Landlord will not be responsible for payment for any labor or materials furnished to the premises at Tenant's request, and no mechanic's or materialman's liens for such labor or materials shall attach to Landlord's interest in the Leased Premises.

7. **Payment Credits.** There shall be a waiver of the rent due for the first twelve months of the lease term and the last three months of the lease term including extensions (for a total of fifteen months), for improvements which have been or are being made to the premises, described in the approved schedule of improvements in Attachment "C". Regardless of the extent of repairs required or

4

the amount expended by Tenant, there shall be no credits toward rent other than the waiver of the rent for the fifteen months specified. There shall be no other credits towards the rent for any other items.

8. <u>Leasing in "As Is" Condition</u>. Landlord is leasing and Tenant is accepting the Leased Premises in their "as is" condition, and Landlord makes no express or implied warranties as to physical condition, fitness for use, suitability, repairability, compliance with any statute, code, ordinance, rule or other governmental provision, or any other warranty.

9. <u>Repair and Maintenance of Premises</u>. Tenant shall, at its expense, be responsible for making any and all repairs, maintenance and improvements of any type to the premises and Landlord shall have no responsibility to make or reimburse for any repairs, maintenance or improvements of any type, without limitation. Specifically, Tenant shall maintain and keep in good repair the foundations, exterior walls, roof, other structural portions of the Leased Premises, all electrical and mechanical portions (heating, plumbing, temperature control systems, etc.) and shall make all other "major repairs". Tenant shall repair or replace broken windows or glass door. Tenant shall, at its expense, maintain the interior of the Leased Premises at all times in good condition and repair, normal wear and tear excepted, and shall commit no waste of any kind in, on or about the Leased Premises, nor create or suffer any nuisance. At the expiration of the term of this Lease, Tenant shall surrender the Leased Premises to Landlord in good condition except for normal wear and tear, damage by fire or other insured casualty for which proceeds are provided to Landlord. If abnormal wear and tear or abuse or waste by Tenant of the Leased Premises is found during the term of this Lease, Tenant shall, upon demand by Landlord, eliminate such abnormal wear and tear or abuse or waste and restore the Leased Premises to their condition subsequent to the rehabilitation repairs made by Tenant pursuant to paragraph 7, normal wear and tear excepted.

10. <u>Parking</u>. Tenant and Tenant's employees, agents, customers and invitees shall have the joint and common use of all of the parking area situated on Tract "K" and on Tract "J-1" jointly with the Landlord's parking for its business, subject to reasonable use rules adopted by Landlord for the benefit of Tenant and/or Landlord (e.g. location of parking for employees to be away from buildings to allow additional space for patrons, etc.) and subject to the use provisions of paragraph 12.

11. <u>Vehicular Ingress and Egress</u>. Tenant and Tenant's employees, agents, customers and invitees shall have the right to use all means of common ingress and egress to the Leased Premises.

12. <u>Use of the Premises</u>. Use of the premises by the Tenant is limited to use as a non-alcoholic dance and show club (including nude dancing) and related legal uses, games area and housing for employees, subject to the following:

    a. <u>No Alcohol</u>. No alcohol may be served on the premises without prior written consent of Landlord in its sole discretion.

    b. <u>Games</u>. No bingo shall be allowed on the premises but other lawful games may be provided, such as pull tabs.

    c. <u>Food</u>. No hot or prepared food may be served on the premises, with the only food authorized and permitted being crackers, pretzels, popcorn and similar cold, dry food. The only exception to this is that food prepared by and provided by Landlord or "Sourdough Mining Company, an Alaskan Restaurant" may be served pursuant to a reciprocal service agreement between the parties.

    d. <u>Hours</u>. The hours of operation may be as Tenant wishes, except that the premises shall not be open to the public between 10:00 a.m. and 7:00 p.m. without prior written consent of Landlord in its sole discretion.

    e. <u>Parking</u>. No use shall be made of the premises which increases the parking use by Tenant or utilizes parking in a manner which interferes with the common use of the

parking area made by Landlord, or which is contrary to the use rules adopted by the Landlord under paragraph 10.

f. **No Interference.** No use shall be made of the premises which unreasonably interferes with Landlord in its operation of the Peanut Farm business.

The premises shall not be used for any other purpose without the express prior written consent of Landlord. Tenant agrees to use the premises in compliance with all municipal, borough, state, federal and other governmental laws (including OSHA, Americans with Disabilities Act, etc.), statutes, ordinances, rules and regulations, and Tenant shall make all modifications and improvements of the premises as necessary to meet these provisions. Tenant shall indemnify, hold harmless and defend Landlord against all claims or charges pursuant to the obligations of Tenant agreed to in this provision and this Lease.

13. **Liens and Encumbrances.** Tenant shall not do any acts, fail to do any acts, or execute any documents which could result in any liens or encumbrances on the leasehold premises, including mechanic's and materialman's liens, mortgages, security interests, assignments for security purposes, deeds of trust or other encumbrances. This provision is not intended to prevent Tenant from encumbering, pledging or giving a security interest in its own trade fixtures, furniture, equipment and personal property for purposes of purchasing, financing or improving that property. Landlord may, at any reasonable time, post upon the property such notices of non-responsibility as to liens for labor or materials supplied to the property as it determines is appropriate and Tenant shall assure their continued posting.

14. **Insurance.**

a. **Liability Insurance.** Tenant shall maintain at its sole cost and expense policies of general public comprehensive liability insurance written by a responsible insurance company licensed to do business within the State of Alaska, sufficiently insuring Landlord and Tenant against liability for personal injury, death or property damage occurring on, in or about the Leased

Premises. Such insurance shall afford protection in limits of not less than (1) $500,000 with respect to injury or death of a single person, (2) $500,000 with respect to any one accident, and (3) $100,000 with respect to property damage. Such policies shall name Landlord as an additional insured and upon request by Landlord, Tenant shall furnish Landlord with copies of all such policies or other acceptable evidence that such insurance is in effect.

    b. <u>Fire and Extended Coverage Insurance</u>. Tenant shall keep and maintain fire and extended coverage insurance on the premises for its full replacement cost. Under this coverage, the loss, if any, shall be payable to Landlord and any lender named as beneficiary of a deed of trust or mortgagee on a mortgage now or hereafter encumbering the property.

    Tenant shall maintain at is sole cost and expense fire and extended coverage insurance on any contents on or in the Leased Premises in such amount as it deems appropriate. Under this coverage, the loss, if any, shall be payable to Tenant.

    c. <u>General Provisions</u>. All policies of insurance required under this Lease shall provide that the proceeds shall be payable to the Landlord and Tenant as their respective interests may appear and shall require at least 30 days prior written notice to Landlord of any amendment, deletion or termination of the policy.

    Landlord shall not be liable to Tenant for loss arising out of damage to or destruction of the Leased Premises, or the building or improvement of which the Leased Premises are a part or with which they are connected, or the contents thereof and all such claims against Landlord for any and all loss, however caused, are hereby waived. Such absence of liability shall exist whether or not the damage or destruction is caused by the negligence of Landlord of by any of its agents, servants, employees or customers. Tenant shall look to its insurance carriers for reimbursement of any such loss, and the insurance carriers involved shall not be entitled to subrogation under any circumstances against any party

to this Lease. The policies of insurance shall specifically provide for this waiver of subrogation rights.

15. **Fire and Other Casualty**. In the event the Leased Premises are destroyed or damaged by fire, earthquake or other casualty Landlord shall receive all insurance proceeds (subject to the rights of any lender) and to the extent of the proceeds received by Landlord, it shall be obligated to use the proceeds received to proceed with due diligence to make repairs to the building and with Tenant to be responsible for any portions required in excess of the insurance proceeds. Provided, however, that if both Landlord and Tenant agree in writing not to repair the damage, then the Landlord shall keep all insurance proceeds relating to the Leased Premises, the lease shall terminate and there shall be no further obligations accruing subsequent to the termination.

16. **Eminent Domain**. If the total of the Leased Premises, or a portion so as to make the Leased Premises unsuitable for the purposes intended under this Lease, is condemned for any public use or purpose by governmental authority, then this Lease shall terminate at the time when possession is taken by such governmental authority, and rent shall be accounted for between Landlord and Tenant as of the date of the surrender of possession. Such termination shall be without prejudice to the rights of either Landlord or Tenant to recover compensation from the condemning authority for any loss or damage caused by such condemnation. Neither Landlord nor Tenant shall have any rights in or to any award made to the other by the condemning authority. Tenant shall be entitled, but not limited, to any award for interruption or relocation of its business, loss of business, loss or taking of its lease improvements, or other loss or damage to its business or limitation on use of the Leased Premises.

If less than the entire Leased Premises is taken and the remainder is still reasonably suitable for operation of the business, then the rent shall be equitably reduced according to the space so taken (including parking areas), and Landlord shall, at

its own cost and expense, restore the remaining portion of the Leased Premises (plus the parking area) to the extent necessary to render it reasonably suitable for the purposes for which it was leased, and shall make all repairs to the building in which the Leased Premises are located to the extent necessary to constitute the building a complete architectural unit.

17. <u>No Assignment or Sublease</u>. Tenant may not assign, sublet or transfer all or any part of the Leased Premises without the prior written consent of Landlord. If contrary to this provision the Leased Premises are occupied by anyone other than Tenant prior to consent by Landlord, Landlord may collect rent from the occupant and apply the rent amount collected to the rent but such action by Landlord will neither waive this provision nor release Tenant from any further performance under the terms of this Lease. Consent once given by Landlord to an assignment, transfer or sublease under this Lease, or any interest therein, shall not release the new tenant from being required to obtain consent in accordance with this paragraph as to any subsequent assignment, subletting or transfer.

18. <u>Holding Over</u>. In the event that Tenant remains in possession of the property after the expiration of the term of this Lease (including optional Lease extension periods), with the consent of Landlord and without a written Lease, Tenant shall be deemed to be occupying the property as a month-to-month tenant, subject to all of the conditions, provisions, terms and obligations of this Lease insofar as they may be applicable to a month-to-month tenant. Such tenancy may be terminated as provided for by the laws of the state of Alaska.

19. <u>Access and Inspection</u>. Landlord and its representatives may enter the premises at all reasonable times during usual business hours for the purpose of inspecting the property or any other reasonable purpose.

20. <u>Default</u>. In the event that Tenant violates or breaches or fails to perform any covenant, agreement, term or condition of this Lease; including, but not limited to, the timely payment of

rent, Landlord may, after providing the notice required by this paragraph: (a) terminate this Lease; or (b) re-enter upon the property without terminating this Lease and relet the property on behalf of Tenant. In the event that Landlord elects either of these options, it may exercise the option only after receipt by Tenant of express written notice, given 30 days in advance of the exercise, setting forth the default and the option Landlord has elected to exercise. Tenant may cure the default without penalty or prejudice at any time during the 30 day period.

    a. **Termination.** In the event that Tenant fails to timely cure a default under the Lease, Tenant shall be liable for the payments and rents unpaid prior to any termination by Landlord.

    b. **Re-entry and Reletting.** In the event that Landlord elects to re-enter the property without terminating this Lease and relet it on behalf of Tenant, it may do so on such terms and conditions, for so many times, for such rent, and for such periods as it chooses, so long as it makes a good faith effort to obtain the highest rental payment throughout the remainder of the Lease term. In the event that Landlord is successful in reletting the property, rental payments received by Landlord from the new subtenant as a result of the reletting shall be offset against any rent, expense and damages owed Landlord by Tenant. Nothing herein shall prevent Landlord from reletting the property for a term in excess of the term specified herein.

    In the event that Landlord re-enters the property to secure it following abandonment or other prolonged absence by Tenant, or enters the property for the purpose of reletting the property or retaking possession thereof, Landlord shall have the right to remove all personal property from the premises and may store the same at any safe and secure place selected by Landlord, including, but not limited to, a private or public warehouse.

    In the event that Landlord violates or breaches or fails to perform any covenant, agreement, term or condition of this Lease, Tenant may, after providing written notice to Landlord and failure or refusal of Landlord to perform: (a) cure the default and

apply the costs and expenses of such a cure as a set-off against future rent payments due under this Lease or recover such costs from Landlord; (b) seek any remedy available in the courts of this State (including specific performance); and (c) terminate this Lease.

21. <u>Non-waiver of Default</u>.  No act or omission by Landlord or Tenant at any time after the happening of any event which would entitle that party to enforce a right under this Lease shall operate as a waiver of any past or future violation, breach, default or failure to keep or perform any covenant, agreement, term or condition hereof or shall deprive that party of its right to terminate or forfeit this Lease or be construed to at any future time estop that party from promptly exercising any option, right or remedy that it may have under any term or provision of this Lease.

22. <u>Covenant of Quiet Enjoyment</u>.  Landlord covenants that Tenant shall peaceably hold and quietly enjoy the Leased Premises without interruption by Landlord, any mortgage or beneficiary under a deed of trust, or any other person, firm, or corporation claiming under them.

Landlord further covenants that any other improvements to be constructed on the remainder of the real property on which the Leased Premises are situated shall not decrease or interfere with Tenant's use, including, but not limited to, ingress, egress, or parking rights for its employees, agents, or customers, nor interfere with the visual exposure of the Leased Premises, nor shall such other use compete with the use of the premises by Tenant.

23. <u>Injunctive Relief for Landlord or Tenant</u>.  In addition to other remedies provided for in this Lease, Landlord and Tenant shall be entitled to restraint by injunction of the violation, or attempted or threatened violation, of any condition or provision of this Lease, or to a decree specifically compelling performance of any such condition or provision.

24. <u>Signs</u>.  Any sign which Tenant purposes to install is subject to the prior written approval of Landlord and to applicable

sign laws. All signs or symbols placed in windows, on doors, or elsewhere in, on, or about the property shall be removed upon termination of this Lease and any damage or injury to the property shall be repaired to its condition prior to such installation.

25. **Arbitration**. Any disagreement between the parties with respect to the interpretation or application of this Lease or the obligations of the parties hereunder shall be determined by arbitration. Such arbitration shall be conducted, upon request of either Landlord or Tenant, before an arbitrator designated by and in accordance with the rules of the American Arbitration Association and the Alaska Uniform Arbitration Act. The arbitrator designated and acting under this Lease shall make its determination in strict conformity with such rules and shall have no power to depart from or change any of the provisions thereof. The expense of arbitration proceedings conducted hereunder shall be borne equally by the parties. All arbitration proceedings hereunder shall be conducted in Anchorage, Alaska.

26. **Option to Extend Lease**. As part of the consideration for this agreement, Tenant shall have an exclusive and irrevocable option to extend this Lease for five additional terms of one year each. All terms and conditions during the Lease extension period shall be the same as set forth in this agreement.

These options to extend shall be exercised by Tenant providing notice to Landlord of its intention to extend not later than 90 days prior to the expiration of the previous Lease term.

27. **Notices**. All notices required under the terms of this Lease or by law shall be in writing, shall contain and clear and concise statement setting forth the reasons therefor, and shall be sent by certified mail, return receipt requested, to the appropriate party at the address specified hereafter or such other address as that party may designate in writing to the other party from time to time.

Address of Landlord:

THE NEW PEANUT FARM, INC.
1225 East International
Airport Road, Suite 235
Anchorage, AK 99518

Address of Tenant:

PINETTE, INC., Terry
Stahlman, and James Goard
P.O. Box 90702
Anchorage, AK 99509

28. **Severability.** If any provision of this Lease is declared invalid or unenforceable, the remainder of the Lease shall continue in full force and effect.

29. **Parties Bound.** The covenants, terms, and conditions contained herein shall be binding upon the heirs, devisees, administrators, executors, assigns, and successors in interest of the parties.

30. **Modification.** No modification of this Lease shall be effective unless in writing and signed by the parties hereto or their duly authorized representatives.

31. **Entire Agreement.** This written Lease constitutes the entire agreement between the parties and supersedes all other prior or contemporaneous agreements between the parties, oral or written, not included herein.

LANDLORD:

THE NEW PEANUT FARM, INC.

By _____
MICHAEL T. JOHNSON, President

By _____
JACK LEWIS, Secretary

TENANT:

(1) PINETTE, INC. (jointly and severally)

By _____
Its Vice President & Sec

(2) _____
TERRY STAHLMAN (individually, personally, jointly and severally)

(3) _____
JAMES GOARD (individually, personally, jointly and severally)

14

STATE OF ALASKA )
) ss.
THIRD JUDICIAL DISTRICT )

THIS IS TO CERTIFY that on this 19th day of April, 1994, before me, the undersigned, a Notary Public in and for the State of Alaska, duly commissioned and sworn, personally appeared MICHAEL T. JOHNSON and JACK LEWIS, known to me and known to be the President and Secretary respectively, named in and who executed the foregoing instrument, and they acknowledged to me that they signed the same freely and voluntarily, for the uses and purposes therein mentioned.

_____
NOTARY PUBLIC - STATE OF ALASKA
My Commission Expires: Sept. 11, 1996

STATE OF ALASKA )
) ss.
THIRD JUDICIAL DISTRICT )

THIS IS TO CERTIFY that on this 19th day of April, 1994, before me, the undersigned, a Notary Public in and for the State of Alaska, duly commissioned and sworn, personally appeared TERRY STAHLMAN, to me known to be the President of PINETTE, INC., the corporation that executed the foregoing instrument; and he acknowledged the execution to be the free and voluntary act and deed of the corporation for the uses and purposes therein mentioned, and on oath stated that he was authorized to execute the instrument.

_____
NOTARY PUBLIC - STATE OF ALASKA
My Commission Expires: Sept. 11, 1996

STATE OF ALASKA )
) ss.
THIRD JUDICIAL DISTRICT )

THIS IS TO CERTIFY that on this 19th day of April, 1994, before me, the undersigned, a Notary Public in and for the State of Alaska, duly commissioned and sworn, personally appeared TERRY STAHLMAN, known to me and known to me to be the individual named in and who executed the foregoing document, and he acknowledged to me that he signed the document freely and voluntarily, for the uses and purposes therein mentioned.

_____
NOTARY PUBLIC - STATE OF ALASKA
My Commission Expires: Sept. 11, 1996

STATE OF ALASKA            )
                           ) ss.
THIRD JUDICIAL DISTRICT    )

THIS IS TO CERTIFY that on this 19th day of April, 1994, before me, the undersigned, a Notary Public in and for the State of Alaska, duly commissioned and sworn, personally appeared JAMES GOARD, known to me and known to me to be the individual named in and who executed the foregoing document, and he acknowledged to me that he signed the document freely and voluntarily, for the uses and purposes therein mentioned.

NOTARY PUBLIC - STATE OF ALASKA
My Commission Expires: Sept. 11, 1996

sourdough\pinette.lse



ATTACHMENT "B"

TAX COMPUTATIONS

Tenant shall reimburse Landlord for:

(a) 100% of real property taxes based upon building valuation

(b) 100% of personal property taxes on all furniture, fixtures, equipment and all contents within the building

(c) 14.37% of the real property taxes based upon land valuation for Tract "K" and "J-1" (based upon agreed computation below)

Computation:

(1) Agreed square footage of building "footprint" (with overhangs):     5,000 sq. ft.

(2) Agreed square footage of Tracts "K" and "J-1":     34,783 sq. ft.

(3) 5,000 ÷ 34,783 = 14.37% of real property taxes for land based on land valuation of Tracts "K" and "J-1"

18

ATTACHMENT "C"

## Approved Repairs

1. Repair or replace roof
2. Repair or replace electrical system
3. Repair or replace plumbing system
4. Repair or replace mechanical (heat and air exchange system) system
5. Repair or replace fire sprinkler system
6. Repair or replace flooring
7. Repair or replace walls
8. Repair or replace doors
9. Repairs and upgrading to meet codes, ordinances, laws, statutes and all other governmental requirements